## R. HOE & CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Second Circuit.
February 4, 1929.

No. 137.

Rose & Paskus, of New York City, and James Craig Peacock, of Washington, D. C. (Benjamin G. Paskus and C. E. Koss, both of New York City, of counsel), for petitioner.

632

Mabel Walker Willebrandt, Asst. Atty. Gen., and Sewall Key, of Washington, D. C., Morton P. Fisher, of Baltimore, Md., and C. M. Charest, Gen. Counsel, and Irwin R. Blaisdell, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). Section 301. (a) of the Revenue Act of 1918 (40 Stat. 1088) levied a profits tax for 1918 at graduated rates of 30 per cent., 65 per cent., and 80 per cent. Section 301 (b) levied a similar tax for 1919 at graduated rates of 20 per cent. and 40 per cent. Section 301 (c) provided as follows:

"(c) For the taxable year 1919 and each taxable year thereafter there shall be levied, collected, and paid upon the net income of every corporation which derives in such year a net income of more than $10,000 from any government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive, a tax equal to the sum of the following:

"(1) Such a portion of a tax computed at the rates specified in subdivision (a) as the part of the net income attributable to such Government contract or contracts bears to the entire net income. In computing such tax the excess profits credit and the war profits credit applicable to the taxable year shall be used;

"(2) Such a portion of a tax computed at the rates specified in subdivision (b) as the part of the net income not attributable to such government contract or contracts bears to the entire net income.

"For the purpose of determining the part of the net income attributable to such government contract or contracts, the proper apportionment and allocation of the deductions with respect to gross income derived from such Government contract or contracts and from other sources, respectively, shall be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary."

Article 714 of Regulations 45 provides that:

"The part of the net income attributable to such government contracts shall be determined in accordance with the following article."

Which in turn provides:

"Art. 715. *Allocation of Net Income to Particular Source.*—Whenever it is necessary to determine the portion of the net income derived from or attributable to a particular source, the corporation shall allocate to the gross income derived from such source, and to the gross income derived from each source, the expenses, losses, and other deductions properly appertaining thereto, and shall apply any general expenses, losses, and deductions (which cannot properly be otherwise apportioned) ratably to the gross income from all sources. The gross income derived from a particular source, less the deductions properly appertaining thereto and less its proportion of any general deductions, shall be the net income derived from such source. The corporation shall submit. with its return a statement fully explaining the manner in which such expenses, losses, and deductions were allocated or distributed."

Section 301 (c) was enacted for the purpose of taxing at the high rates obtaining in 1918, while the war was in progress, net income derived from contracts with the government entered into during the war. While there were no war profits during 1919, and the profits upon contracts made during that year were subjected to lower rates, section 301 (c) was intended to catch the extremely high profits from war contracts realized after the war.

The Board of Tax Appeals sustained the tax assessed by the Commissioner on the payments, aggregating $324,368, for · expenses and loss on the ground that this sum represented income derived from war contracts and that there was no competent proof submitted of expenses which might be charged against it.

The taxpayer contends:

(1) That section 301 (c) of the Revenue Act of 1918, under which the tax has been assessed, is based on an arbitrary classification and therefore violates the Fifth Amendment of the Constitution.

(2) That the payments in question were not made under the original war contracts, but were received under the 1919 agreements, and were, therefore, *derived* from and attributable to those agreements alone.

(3) That, even if the payments be regarded as gross income derived from the original war contracts, yet there was no net income subject to taxation because of the proof that the losses and expenses were more than sufficient to offset these payments.

█ The contention that the act laying a high tax on government war contracts is unconstitutional is without merit. The profits earned under war contracts were in general abnormally high, so that it was reasonable to impose higher rates upon them than on the

profits of contracts made at a later time. There was a special reason to single out government contracts. The government was likely to have to pay more than a responsible private corporation because of difficulty in dealing with it in the event of any dispute and the delays which might occur in obtaining payment for lack of adequate appropriations. And there was, moreover, always the chance, which befell the taxpayer in this case, of the cancellation of contracts, due to the sudden ending of the war. All contractors of the same class were taxed under the act upon the same basis, and as there was a real difference between government and nongovernment contractors, we have no doubt that the classification was a justifiable one, and that the act was constitutional. Flint v. Stone Tracy Co., 220 U. S. 107, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; Brushaber v. Union Pac. R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713.

█ The taxpayer's second contention is likewise unsound. It is, of course, true that the contracts of cancellation completely supplanted the earlier agreements and embodied the only existent contractual obligations. But section 301 (c) imposes a special tax for 1919 "upon the net income of every corporation which *derives* in such year a net income * * * from any government * * * contracts" made during the war. It is quite immaterial that the war contracts no longer existed when the payments were made. These original contracts furnished the basis for the post-war contracts and the consideration upon which the latter rested. Therefore the payments, though made under the post-war contracts were *derived* from the war contracts.

█ If, then, the payments were derived from the war contracts, we must look to those contracts to discover whether the payments represented *net* income, for only *net* income is taxable under section 301 (c). It is quite clear that the payments were for anticipated losses arising from the changes in the taxpayer's plant necessitated by the cessation of manufacturing gun mounts for the Navy Department. While they were income derived from the ordnance contracts, yet, by the very terms under which they were made, they implied an offset in expenditures in remodelling the plant to at least an equal amount. The ultimate questions, therefore, are whether such expenditures would be proper deductions in arriving at net income,

and whether those expenditures were properly proved.

If the contracts had gone on to completion, the receipts, less only the outgo in the manufacture of the gun mounts, would not have represented the real net profits. The company was in the ordnance business only during the war, the resumption of its old business was thereafter necessary for its well-being, and the expense of such resumption was caused by temporarily adapting its plant to make gun mounts under the war contracts. The profit of an enterprise which involved the predetermined expense of changing the plant when the business changed can only be arrived at by making a proper allowance for that expense. Indeed, we do not suppose that the government disputes this, and counsel for the Commissioner state in their brief (at page 11): "Had there been legal proof that the sums had been paid out as deductible expenses, there would have been no tax thereon."

█ Such being the case, and it being evident from the record that there was some offset to these payments which represented gross and not net income, the only question which remains is whether the taxpayer's proof of the deductions which it claims the right to have allowed was adequate. To be sure, the sums in question were based upon anticipated expenses that had not all been actually paid at the time when the adjustments with the Navy Department were effected. Yet these adjustments were made by experienced people acting at arm's length, and it is going much too far to say that they have no probative force as to the real loss which the taxpayer suffered under the original contracts. It is hard to see why one department of the government could not bind another as to the extent of this loss. Moreover, there was proof that the estimated loss was far greater than the amounts allowed by the Navy Department and that the actual loss was also greater. The testimony of the taxpayer's vice president, who had full charge of the negotiation and of the reconstruction of the plant was to this effect, but it was stricken out on the ground that the books were the best evidence (record, folio 151), and that it was only opinion evidence.

The books contained no separation between the items relating to the cost of reconstruction and those of the other business, so that they might have been of little service had they been before the Board. They were not in themselves primary evidence, unless supplemented by the testi-

634

mony of those making the entries and by proof that the entries were correct. Otherwise they could only be used to refresh recollection in case they served that purpose. And they were available to the government if it desired them for cross-examination.

The objection that the books were the best evidence was clearly insufficient, for they were not necessary at all as a part of the taxpayer's proof. Keene v. Meade, 3 Pet. 1, 7 L. Ed. 581; Forster Mfg. Co. v. Cutter-Tower Co., 215 Mass. 136, 101 N. E. 1083; National Ulster County Bank v. Madden, 114 N. Y. 280, 21 N. E. 408, 11 Am. St. Rep. 633. The testimony of Kelly was not secondary evidence. Central Commercial Co. v. Jones-Dusenbury Co. (C. C. A.) 251 F. 13. If it was not sufficiently specific, the objection should have been taken for that reason, so that the taxpayer could elaborate it further. Burton v. Driggs, 20 Wall. 125, 22 L. Ed. 299. The witness was a person who, more than any one else, knew the facts and could estimate the expense and loss. We cannot say that his uncontradicted statement that there were expenses greater than the payment made should go for nothing, particularly when it was fortified by the written admission of the parties that the expenses would equal the payments made. If any valid objection could have been made, it would really have gone to the insufficiency, rather than to the competency of the evidence. There seems to have been sufficient proof of the ratable deductions to be allocated to the gross income in question under article 715 of Regulation 45.

We hold that the Board of Tax Appeals erred in concluding that any part of the $324,368 gross income in question should be subjected to the higher tax rates of section 301 (c). Its decision is accordingly reversed, and the proceeding is remanded, with direction to the board to determine petitioner's tax on the basis that no part of the said $324,368 was net income subject to tax under section 301 (c) of the Revenue Act of 1918.